# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JIMMY D. RIDGE, Executor of the Estate of DAVID SCOTT RIDGE, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | **MEMORANDUM OPINION AND RECOMMENDATION** |
| v. | ) ) | 1:07CV366 |
| CITY OF RANDLEMAN, JONATHAN S. LEONARD, individually and in his official capacity as an officer of the Randleman Police Department, SAMUEL J. MCADAMS, individually and in his official capacity as an officer of the Randleman Police Department, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter has been referred to the undersigned on a motion for summary judgment (docket no. 51) filed by Defendants Jonathan S. Leonard, Samuel J. McAdams, and the City of Randleman. Plaintiff has responded in opposition to the motion. In this posture, the matter is ripe for disposition. Furthermore, the parties have not consented to the jurisdiction of the magistrate judge. Therefore, the motion must be dealt with by way of recommendation. For the reasons discussed herein, it will be recommended that the court grant the motion for summary judgment.

## I. Background

After the decedent David Scott Ridge was fatally shot by City of Randleman police officers, the executor of his estate brought suit against various defendants under 42 U.S.C. § 1983, alleging excessive force in violation of the Fourth and Fourteenth Amendments, negligence, and wrongful death under N.C. GEN. STAT. § 28A-18-2. On April 5, 2007, Plaintiff filed this action in Randolph County Superior Court. On May 9, 2007, Defendants removed the action to this court based on federal question jurisdiction. On May 11, 2007, Defendants filed a motion to dismiss and an Answer.

On August 17, 2007, the undersigned recommended that Defendants' motion to dismiss be granted in part and denied in part. On June 13, 2008, upon a *de novo* review, the district court dismissed all but the following claims against the following Defendants: (1) Plaintiff's Section 1983 excessive force claims against Officers Jonathan Leonard and Samuel McAdams in their individual capacities; (2) Plaintiff's Section 1983 claim against the City of Randleman; (3) Plaintiff's negligence claim against the City of Randleman; (4) Plaintiff's wrongful death claim against the City of Randleman; (5) Plaintiff's wrongful death claims against Officers Jonathan Leonard and Samuel McAdams in their individual capacities to the extent that the claims are based on reckless and wanton conduct; and (6) Plaintiff's punitive damages claim against Officers Jonathan Leonard and Samuel McAdams in their individual capacities pursuant to Section 1983. Defendants Leonard, McAdams, and

City of Randleman have now filed a motion for summary judgment on the remaining claims.

## II. Facts

On April 13, 2005, just before midnight, 911 dispatchers received a call from Frank Havens, who reported that the deceased, David Scott Ridge, had shown up on Havens' front porch, in an emotional and drunken state, asking about Havens' ex-wife Deborah Havens, who had been dating Ridge and who had recently broken up with him. Frank Havens reported to 911 dispatchers that Ridge was carrying a shotgun with him and that he had just left Havens' house. Soon thereafter, Deborah Havens called 911 to report that Ridge was parked outside of her home. Deborah Havens reported to 911 dispatchers that Ridge was a suspect in an arson that occurred outside of Deborah Havens' place of employment on April 12. Ridge was aware that he was a suspect in the arson. While Deborah Havens was on the phone with the 911 dispatchers, Ridge drove away.

Within moments of Deborah Havens' 911 call, Defendant Jonathan Leonard, a Randleman police officer, began pursuing Ridge after he observed Ridge's car going 62 mph in a 45 mph zone. When Officer Leonard began pursuing Ridge, he was not aware that other officers were already looking for Ridge because of the previous 911 calls from Frank Havens and Deborah Havens. When it was discovered that the vehicle stopped by Officer Leonard belonged to Ridge, other officers were warned, via dispatch, to consider Ridge armed and dangerous.

-3-

Defendant Samuel McAdams, also a Randleman police officer, received the dispatch warning about Ridge being armed and dangerous.

Officer Leonard pursued Ridge until Ridge pulled his car over and stopped in a driveway. According to Defendants, Ridge then got out of his car and began walking towards Leonard. Ridge had been injured in a motorcycle accident and walked with a cane for support. The cane that Ridge was using on the night he was killed had an eighteen-inch sword connected to it (described in the record as a "cane sword"). While walking towards Officer Leonard, Ridge pulled the sword out of the cane, began lunging at Officer Leonard with it, and then ignored Officer Leonard's repeated warnings to drop the sword. Officer Leonard then called for help on his police radio.

During the confrontation between Officer Leonard and Ridge, Officer McAdams arrived on the scene. Officers McAdams and Leonard both shot Ridge, and Ridge subsequently died. An autopsy revealed six bullet wound tracks entering the front and back of Ridge's trunk, with a graze wound from a seventh bullet on his left index and middle fingers. EMS was immediately called to the scene after Ridge was shot, and the SBI took over the investigation of the shooting. The Randolph County District Attorney subsequently cleared Officers Leonard and McAdams of any wrongdoing in the shooting.

## III. Discussion

<u>Standard of Review</u>

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56©; *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

-5-

<u>Excessive Force, Negligence, and Wrongful Death Claims Against Officers Leonard and McAdams</u>

"[C]laims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard." *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004). "The intrusiveness of a seizure by means of deadly force is unmatched." *Tenn. v. Garner*, 471 U.S. 1, 9 (1985). Officers may reasonably use deadly force, however, when they have "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11. The objective reasonableness of an application of deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Finally, each case involving a claim of excessive force is fact-specific, and "due regard must be given to the fact that police officers must make split-second judgments about the amount of force necessary . . . in circumstances that are stressful and rapidly changing." *Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir. 1988).

Defendants' evidence on summary judgment includes affidavits from Officers Jonathan Leonard and Samuel McAdams, Chief of Police Steven Leonard, and Dr. John Combs, who provided an expert report on use of excessive force. (See docket nos. 52-55.) Defendants' evidence also includes the SBI Report following the SBI investigation into the shooting. (*See* SBI Report, attached as Exhibit D to docket no.

63.)  Officer Jonathan Leonard describes the circumstances of Ridge's death in an

affidavit as follows:

> 4.  I began my shift at 6:00 p.m. on April 13, 2005.  On April 14, 2005, at approximately 12:10 a.m., just after midnight, I observed Mr. Ridge's vehicle.  At the time, I was driving a marked patrol car and was in full uniform.  I was heading north on US-220 (also known as Main Street) and Mr. Ridge was driving a silver car in a southerly direction on US-220.  I locked my radar in on his vehicle and noted that he was driving sixty-two miles per hour in a forty-five mile per hour zone.  I made a decision at that time to follow and stop Mr. Ridge's vehicle in order to give him a warning about his speed.

> 5.  After I turned my patrol car around, I noticed Mr. Ridge's vehicle on US-311.  I turned my car onto US-311 and got behind Mr. Ridge's vehicle.  I did not have my lights and siren on yet.  When I got behind Mr. Ridge's vehicle, Mr. Ridge stopped his car abruptly in the road by breaking hard.  His car swerved to the left before coming to a full stop in the road.  Because of the abrupt nature of the stop, I had to swerve to the right in order to avoid hitting Mr. Ridge's car.  My car, too, came to a stop in the road.  At this point, I observed Mr. Ridge put his hands up in the air and shrug his shoulders.  He then continued driving down US-311.  This was not typical behavior.

> 6.  At this point, I activated my lights and siren and continued to follow Mr. Ridge.  Mr. Ridge did not immediately stop.  Instead he continued driving on US-311.  When Mr. Ridge got to Brown Loop Road, I thought he was going to stop.  He did not.  Mr. Ridge turned and continued driving down Brown Loop Road for approximately eighty yards before turning right into a driveway where he finally stopped his car.  I was in the process of stopping my car behind Mr. Ridge's car when I noticed that upon stopping his car, Mr. Ridge immediately and abruptly opened his door, exited his car and started to walk in my direction. . . .  I attempted to put my car quickly into the "park" mode but, in the haste of the situation, I put the car in "neutral" instead and it slowly rolled into Mr. Ridge's vehicle, lightly tapping it. . . .

> 7.  As I walked to Mr. Ridge's car, I told Mr. Ridge that he needed to get back in the car.  I had to tell him several times but he did eventually get back into his car.  I informed Mr. Ridge that I was going to have to call another officer to the scene to complete an accident report.  During this

conversation, I asked Mr. Ridge if he had been drinking and he stated "a little."

8.   After the above noted conversation, I returned to my patrol car to check Mr. Ridge's license plate number and provide information to dispatch regarding the stop.  While I was in my car, I saw Mr. Ridge get out of his car again and start walking toward my patrol car.  He was doing so despite that I had previously told him that he needed to stay in his car.  As Mr. Ridge approached my car, I noticed that [he] had a cane in his right hand that he was using to walk.  Mr. Ridge started to talk about his daughter but I could not really understand everything that he was saying.  He seemed upset.  I observed Mr. Ridge, at this point, put his hand in or near his left pants pocket.  For officer safety reasons, I told him to take his hand out of his pocket and he complied.

9.  I told Mr. Ridge, again, that he needed to return to his car.  At this point, Mr. Ridge made a comment to the effect of "you are going to have to shoot me."  Using his right hand, he pulled a long knife/sword from the cane that he had in his hand.  The blade appeared to me to be 12 to 14 inches long.  (According to the SBI Report, the knife was 18 inches long). . . .   I was standing only five to six feet from Mr. Ridge when he pulled out the knife.  When I saw Mr. Ridge pull his right arm back as if to swing the blade toward me, I dropped my Nextel and flashlight. . . .

10.   I drew my weapon at this point and started walking backwards down Brown Loop Road.  I repeatedly told Mr. Ridge to drop the knife which he refused to do.  Instead, he kept walking at me as I continued to walk backwards.  As I was walking backwards, I called for assistance on my police radio.  As we continued to walk in this manner, Mr. Ridge swung the knife in my direction on several occasions.  When he was not actively swinging the knife at me, Mr. Ridge held the knife up in my direction in a position where he could, if he chose, swing it at me.  He was holding the knife in a very threatening manner and I was afraid for my life.

11.   While we were walking in the manner described above down Brown Loop Road, I heard Officer Justin McAdams arrive.  He called out his call number to let me know his position.  Mr. Ridge continued to walk towards me as I walked backwards.  He continued to hold the knife in a threatening manner.  I repeatedly told Mr. Ridge to drop the knife but he would not.  He cursed at me and threatened me.  He called

-8-

me derogatory names and told me that I was going to have to shoot him.

12. After walking like this for approximately seventy yards, Mr. Ridge suddenly turned around and started walking back in the direction of the vehicles. He did not drop the knife. I started walking behind Mr. Ridge and continued to ask him to drop the knife. After walking just a few feet in this direction, Mr. Ridge abruptly turned around and started to come at me with the knife in what I perceived to be an aggressive and lunging manner.

13. Because I was in fear for my life and believed Mr. Ridge constituted a deadly threat, I called out Officer McAdams' call sign so that I could determine his position. I wanted to make sure that he was not in my line of fire. When Officer McAdams responded, I fired my weapon. Mr. Ridge was approximately six feet away from me at the time and was coming toward me with the knife. I felt that my life was in imminent danger. I fired my weapon because I did not want to be killed by Mr. Ridge. Mr. Ridge was acting in a very threatening manner and I was in fear for my life. It was dark outside but there was enough light that I could see him. Mr. Ridge had a long knife/sword in his hand and there was very little distance between us. He refused to put the knife/sword down despite my orders that he do so. He was not acting rationally and was cursing and threatening me. He had turned around abruptly in my direction after starting to walk toward the cars. He was coming in my direction and was holding the knife in a threatening and aggressive manner when I shot him.

14. I fired at Mr. Ridge until he fell to the ground. As I fired my weapon, Officer McAdams also fired his weapon. We both perceived, at the same time, that Mr. Ridge constituted a deadly threat. I do not know how many rounds that I fired but I recall pulling the trigger several times. Mr. Ridge was slightly to my left when I fired my first shot but still in front of me, facing in my direction, when I started to shoot. He had the knife/sword in his right hand. Mr. Ridge was facing in my direction immediately before I shot him but he was also moving and walking toward me. He was not a stationary target. I do not know where my shots hit him or which shot hit him first. Mr. Ridge ultimately landed on his back but likely twisted, turned and spun around to some extent as I fired at him and while he was falling. Officer McAdams was also shooting at him from a different angle and location. While Mr. Ridge ultimately landed on his back and then stopped moving, he may

-9-

have initially landed on his side and then rolled to his back before he stopped moving entirely. As he fell, the knife dropped behind him and landed out of his reach. . . .

(Leonard Aff., docket no. 52.) Officer McAdams also describes the incident in an affidavit as follows:

4. I began my shift at 6:00 p.m. on April 13, 2005. On April 14, 2005, at some point right after midnight, I received a Nextel call from Officer Jonathan Leonard wherein Officer Leonard indicated that he was attempting to stop a vehicle on US-311 in Randleman, North Carolina. He stated that the driver was acting crazy; that he had slammed on brakes and then sped away from him. After the driver stopped his vehicle in a driveway off Brown Loop Road, Officer Leonard informed me that he had hit the driver's rear bumper, and needed officer assistance for an accident report.

5. Prior to receiving Officer Leonard's call, I had overheard, via radio, that Randolph County deputies were being dispatched to a Caudle Road location where it was reported that an intoxicated subject with a gun had approached a resident there. It was thereafter reported that the resident was the ex-husband of the suspect's ex-girlfriend and that the suspect was now in the ex-girlfriend's driveway. The ex-girlfriend reported that the suspect, identified as David Scott Ridge, was suspected in starting a fire the night before at a florist shop in Asheboro.

6. While en route to assist Officer Leonard, I heard via radio that the vehicle involved in Officer Leonard's stop on Brown Loop Road was the vehicle of the Caudle Road suspect. All officers involved were advised via radio to use caution as Mr. Ridge was reported to be armed, upset and intoxicated. . . .

7. Right before I arrived at the Brown Loop Road, I heard Officer Leonard call out, via radio, that he needed assistance quickly–a signal zero. I arrived at the scene within seconds of this call. I saw the parked vehicles and upon getting out of my car, I saw Mr. Ridge walking down the road approximately fifty to seventy feet from where the cars were parked. Officer Leonard was in front of Mr. Ridge, facing Mr. Ridge, and walking backwards–as if back pedaling. When I first saw the men, they were about fifteen to twenty feet apart. Mr. Ridge

-10-

was carrying a long knife/sword in his right hand and was making jabbing motions toward Officer Leonard. Officer Leonard had his weapon drawn and was ordering Mr. Ridge to drop the knife.

8. I ran behind some houses to get closer and to stay out of the line of fire. From what I observed, Officer Leonard was already in imminent danger at this time and I thought that it was possible that Officer Leonard would have no choice but to fire his weapon. I did not want to be in the line of fire. I could hear Officer Leonard asking me for my position.

9. When I came from behind one of the houses, I saw the two men standing in the street. At this point, Mr. Ridge turned in the opposite direction and took a few steps in the direction of the vehicles. After just a few steps, though, he turned back suddenly in the direction of Officer Leonard and appeared to me to lunge at Officer Leonard with the knife. Officer Leonard started back pedaling again and continued to order Mr. Ridge to drop the knife. During this time, Mr. Ridge was cursing at Officer Leonard. He told Officer Leonard that he would kill him. He also shouted for Officer Leonard to kill him. He was holding the knife in a very threatening and aggressive manner and was not acting rationally.

10. When I got to a location about twenty feet from the men, it appeared to me that Mr. Ridge was starting to close in on Officer Leonard. From where I was standing, it looked like Mr. Ridge was about fifteen feet from Officer Leonard at this time. Officer Leonard asked me if he had a good position to fire and I told him that he did. I told him not to let Mr. Ridge get any closer. It was clear to me that Officer Leonard's life was in danger and that Officer Leonard was afraid for his life.

11. At this time I ordered Mr. Ridge to drop the knife. He did not. Instead, he moved closer to Officer Leonard in a lunging type motion. At this point, both Officer Leonard and I fired our weapons at Mr. Ridge. I was to Mr. Ridge's right side when I fired my weapon. To the best of my knowledge, I fired two rounds. When I fired, Mr. Ridge was facing Officer Leonard. He was not a stationary target, however. He was moving in Officer Leonard's direction when we fired. I do not know which shots hit him or which shot hit him first. Mr. Ridge ultimately landed on his back but likely twisted, turned and spun around to some extent as we fired at him. While Mr. Ridge ultimately landed on his

-11-

back and completely stopped moving, he may have initially landed on his side and then rolled, on his own, to his back before he stopped moving entirely. We did not roll Mr. Ridge over or attempt to move him after the shooting. . . .

14. I shot Mr. Ridge because he constituted a deadly threat that night and I perceived him to be a deadly threat. I truly believed that he was going to kill Officer Leonard.

(McAdams Aff., docket no. 53.) In statements attached to their Affidavits, the officers further described their fears on the night in question, as well as Ridge's aggressive and dangerous behavior. (Leonard Aff. Exs. A & B; McAdams Aff. Ex. A.)

In support of the motion for summary judgment, Defendants contend that the evidence of record establishes as a matter of law that the officers' use of deadly force against Ridge was reasonable, justified, and authorized by law. I agree. The evidence of record shows that Ridge had a sword in his right hand; he was brandishing it at Officer Leonard and holding it in a threatening and aggressive manner; and he was cursing and verbally threatening Leonard. Furthermore, he refused Officer Leonard's orders to drop the sword, and Ridge backed Officer Leonard down the street for seventy yards with the sword. Before he was shot, Ridge had abruptly turned and lunged at Officer Leonard. According to Officer Leonard, Ridge was six feet from him when he fired, and he was still moving toward Officer Leonard when the officers fired their weapons. (McAdams Aff. ¶¶ 7-14; Leonard Aff. ¶¶ 6-14.)

The evidence further shows that Officer Leonard did not take his weapon out until after Ridge startled him with the sword. (Leonard Aff. ¶ 9.) Moreover, when he

-12-

arrived on the scene, Officer McAdams was aware that Ridge was the suspect in the prior 911 calls regarding a highly impaired, unstable individual armed with a shotgun. (McAdams Aff. ¶¶ 5, 6; Ex. D to McAdams Aff.)  In sum, the evidence shows that Officers Leonard's and McAdams' use of force was objectively reasonable under the circumstances, and summary judgment should be granted as to Plaintiff's excessive force claim against them.[1]

As Defendants note, the Fourth Circuit has held that summary judgment should be awarded to the defendant officers in other excessive force cases with facts even less favorable to the defendant officers than the facts in this case.  For instance, in *Sigman v. Town of Chapel Hill*, the plaintiff's decedent, Sigman, barricaded himself in his house after a domestic disturbance. 161 F.3d 782, 784 (4th Cir. 1998).  The evidence showed that the decedent was intoxicated; verbally threatened the officers through a window; told the officers that he was going to kill them; told the officers that they were going to have to shoot him; and brandished a knife at the officers through a window.  *Id.* at 784-86.  When the decedent exited the house, he was holding a knife in his hand in a threatening manner, and he began

---

[1]  Defendants contend, also, that the defendant officers are entitled to qualified immunity.  Because the court should find no constitutional violation in the first instance, there is no need to conduct a qualified immunity analysis.  *See generally Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009) (abrogating *Saucier v. Katz,* 533 U.S. 194 (2001), by holding that courts are not required to determine whether a violation of a constitutional right occurred before determining whether the right was clearly established for purposes of qualified immunity).

approaching the officers. *Id.* When the decedent got within ten feet of one of the officers, an officer fired his weapon, fatally wounding the decedent.

The decedent's parents subsequently sued the defendant police officers, alleging excessive force in a Section 1983 action and bringing a wrongful death claim under state law. *Id.* at 785. In response to the defendants' summary judgment motion before the district court, the plaintiffs presented testimony from three witnesses across the street who had stated that the decedent came out of the house with his hands raised; that there was no knife in the decedent's hands when he exited the house; and that the decedent represented no threat to any of the officers. *Id.* at 786. Despite this testimony from the three witnesses, the district court granted summary judgment for the defendant officers, finding that the police officer who shot the decedent acted reasonably in the circumstances confronting him. *Id.*

On appeal, the *Sigman* Court affirmed, specifically finding that the defendant officer enjoyed qualified immunity, and stating, "It is undisputed that the atmosphere was volatile and threatening. These circumstances are exactly the kind that a qualified immunity analysis requires us to consider." *Id.* at 787. The court noted that the witnesses were not as close to Sigman as the officers were, and that it was undisputed that a knife was found at the scene after the shooting. *Id.* at 788. The court observed:

> Where an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently–and potentially still is–armed, and

who is coming towards the officer despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable.

*Id.*

The facts in this case are even less favorable to Plaintiff than the facts presented in *Sigman* were to the plaintiffs in that case. That is, in *Sigman* the court found that the officer acted reasonably, despite the statements of three witnesses contradicting the officer's version of what happened before Sigman was shot. Here, the only persons present at the shooting were Ridge and Officers Leonard and McAdams, and, as the SBI Report concludes, the physical evidence supports the officers' version of events leading to the shooting of Ridge. *See also Mace v. City of Palestine*, 333 F.3d 621, 622-23 (5th Cir. 2003) (affirming summary judgment based on qualified immunity where the officers shot the plaintiff's decedent who, while brandishing an eighteen- to twenty-inch sword, came within eight to ten feet of the officers, where the decedent had been intoxicated, had threatened to kill himself, and had verbally threatened the officers); *Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991) (affirming summary judgment in favor of the defendant officers where the officers shot the plaintiff's decedent when he advanced at the officers with a raised machete and refused the officers' orders to drop it). In sum, the officers' use of force in this case was objectively reasonable under the circumstances and summary judgment should be granted as to the excessive force claim. Furthermore, because the court has found that the defendant officers' actions were, as a matter of law, reasonable under the circumstances, they did not act

-15-

negligently or wrongfully under N.C. GEN. STAT. § 28A-18-2. Therefore, Plaintiff's state law claims of negligence and wrongful death against Officers Leonard and McAdams also fail.

In response to the summary judgment motion, Plaintiff has presented no admissible evidence to raise an issue of fact as to whether the officers' use of force was reasonable under the circumstances. Plaintiff attempts to raise an issue of fact by speculating that the events leading up to Ridge's shooting did not occur as described by Officers Leonard and McAdams. To do this, Plaintiff has submitted affidavits from Ridge's father Jimmy Ridge and Ridge's brother Brian Ridge, in which the two men speculate on the events of the night in question and attempt to raise doubts regarding the version of events as recounted by Officers Leonard and McAdams. (*See* Affidavits of Jimmy Ridge and Brian Ridge, docket no. 63.) For instance, Ridge's father speculates in his affidavit that, based on his own research and calculations, when Ridge was shot he was too far away from Officer Leonard to be a danger and was not lunging at Officer Leonard; he was trying to surrender; and he had already given up his weapon. Ridge's father further opines that Ridge was more than 25 feet away from Officer Leonard when Ridge initially drew the knife on Officer Leonard, and that when Leonard shot Ridge he was advancing towards Ridge rather than trying to maintain a safe distance from Ridge. The affidavit of Ridge's brother contains similar testimony, in which he concludes, based on his

-16-

observation of the scene, that the shooting could not have occurred as reported by Officers Leonard and McAdams.

Through the affidavits of Jimmy Ridge and Brian Ridge, Plaintiff also attempts to cast doubt on Officer Leonard's statements that the minor damage to Ridge's car occurred after Ridge had pulled over on Brown Loop Road and when Officer Leonard left his car in neutral gear so that it rolled and bumped into Ridge's car. Plaintiff speculates, without any supporting evidence, that Officer Leonard's car collided with Ridge's car earlier in the evening during a high-speed chase, while Officer Leonard was traveling more than 100 mph. Essentially, Plaintiff's theory is that Officer Leonard's car rammed into Ridge's car during the high-speed chase, and that Officer Leonard then pursued and shot Ridge in order to get rid of any witnesses to Officer Leonard's alleged reckless behavior.

The affidavits of Ridge's brother and father do not raise an issue of fact sufficient to withstand Defendants' motion for summary judgment. First, they are not affidavits made on personal knowledge as to the events on the night in question. Furthermore, neither Ridge's father nor his brother has been qualified to render an expert opinion regarding the physical evidence at the scene of the shooting or the appropriateness of the force used by officers. Therefore, the testimony from Ridge's

-17-

father and brother regarding their opinions of what transpired in the events leading up to Ridge's death is simply not admissible.[2]

As to Plaintiff's theory that Officer Leonard shot Ridge to cover up prior reckless driving by Leonard and an earlier collision, Defendants note that Officer Leonard immediately reported to Officer McAdams that his car had bumped into Ridge's vehicle when Ridge pulled over into a driveway on Brown Loop Road, and Officer Leonard reported the same thing to an SBI agent who interviewed Officer Leonard at 3:47 a.m. the night of the shooting. Defendants make the valid point that if Officers Leonard and McAdams were engaged in some sort of cover-up, Officer Leonard would not have even mentioned his car bumping into Ridge's because the property damage to Ridge's vehicle was not even visible. In sum, Plaintiff simply fails to present any admissible evidence through Jimmy and Brian Ridge's affidavits to show that the events as recounted as by Officers Leonard and McAdams are not supported by the evidence of record.

In addition to the affidavits submitted by Jimmy Ridge and Brian Ridge, Plaintiff also offers an affidavit and expert report of forensic pathologist Dr. Donald Jason. (*See* Affidavit of Donald Jason, docket no. 63.) Dr. Jason stated that in

---

[2] For the same reason, the court should strike the video re-enactment prepared by Ridge's father and brother, as well as the statement in the affidavits that Officer Leonard had wrecked his cruiser less than a week before Ridge's death in what his counseling report concluded was an "avoidable" accident. (*See* Brian Ridge Aff. ¶ 12.) This testimony is irrelevant to the excessive force claim, as well as inflammatory and prejudicial and should, accordingly, be stricken.

-18-

preparing his report, he reviewed various materials, including the affidavits of Officer Leonard, Officer McAdams, Police Chief Steven Leonard, and Defendants' expert Dr. Combs.[3] Based on his examination, Dr. Jason concluded that Officers Leonard's and McAdams' version of events are not supported by the physical evidence in four significant ways.[4]

First, Dr. Jason opines that because Ridge was shot by Officer Leonard while presenting the left side of his body towards Officer Leonard, he could not have had the sword, stated to be in his right hand, between himself and Officer Leonard in a threatening position when the shots were fired. As for this opinion, the fact that Ridge may have been turned with the left side of his body facing Leonard at the exact moment that Leonard shot Ridge does not create an issue of fact as to the excessive force claim. The overwhelming evidence of record is that, in the moments leading up to the shooting, Ridge was moving towards Officer Leonard in a threatening manner while holding a sword in his right hand. Indeed, the fact that the left side of Ridge's body may have been facing Officer Leonard when Ridge was shot arguably supports the conclusion that Officer Leonard reasonably perceived

_____

[3] Dr. Jason also reviewed a video re-enactment of the scene of the shooting as performed by Jimmy Ridge, Brian Ridge, and others. As noted, the video re-enactment is not admissible. *See supra* n.2.

[4] This expert testimony is admissible, as courts have held that, particularly in cases of use of deadly force in which the only surviving witness to the shooting is often the defendant officer, an expert may testify regarding the physical evidence to determine whether the officer's version of events is consistent with the physical evidence. *See Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195-96 (4th Cir. 2006); *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

-19-

that his life was in danger when he shot Ridge.  That is, if Ridge were about to lunge at Officer Leonard with the sword in his right hand, he could have stepped forward with his left side to draw momentum as he swung his right hand around to lunge at Officer Leonard.  Thus, Dr. Jason's opinion regarding the position of Ridge's body when he was shot does not raise a genuine issue of fact as to whether Officer Leonard acted reasonably under the circumstances.

Dr. Jason also notes that the sword was found twenty feet behind Mr. Ridge's feet, away from Officer Leonard.  Dr. Jason opines that the position of the sword is consistent with Ridge having dropped it there when he took the initial steps away from Officer Leonard before turning back to come towards him.   Again, even assuming Ridge dropped the sword before he turned around to come towards Officer Leonard, what is relevant is whether Officer Leonard reasonably *perceived* that Ridge still had the sword in his hand when he turned back towards Officer Leonard, or whether Ridge was otherwise approaching Officer Leonard in a threatening manner so that Officer Leonard reasonably perceived that he was in immediate danger.  Even where officers are mistaken as to the presence of a weapon, the courts have ruled in favor of officers as a matter of law when the officers reasonably perceived that the suspect possessed a weapon.  *See, e.g., Anderson v. Russell*, 247 F.3d 125, 129-33 (4th Cir. 2001) (affirming summary judgment to the defendant officer where the officer incorrectly, but reasonably, believed that the plaintiff was reaching for a gun); *McLenagan v. Karnes*, 27 F.3d

-20-

1002, 1006 (4th Cir. 1994) (where the court ruled that summary judgment should have been granted in the officer's favor on the grounds of qualified immunity where the officer wrongfully but reasonably believed that the suspect was armed); *Slattery v. Rizzo*, 939 F.2d 213, 215-17 (4th Cir. 1991) (reversing the denial of the officers' summary judgment motion based on qualified immunity, where the plaintiff was not armed with a weapon as the officers had thought, but where a reasonable officer could have believed that the plaintiff was armed).  A witness's statement that it was clear that there was no weapon in a suspect's hand may be relevant to determine whether the police officer reasonably believed that the suspect was armed.  Here, however, Plaintiff's expert was not a witness to the shooting, and he has merely speculated as to the relative positions of Ridge, Ridge's sword, and Officer Leonard when Ridge was shot.  In sum, regardless of whether Ridge actually had the sword in his hand when he was shot, the evidence of record supports a finding that Officers Leonard and McAdams did reasonably believe that Ridge was coming at Officer Leonard with a sword before he was shot and that Officer Leonard's life was in danger.

Next, Dr. Jason notes in his affidavit that a pool of blood was found to the right of Ridge's body after the shooting.  Dr. Jason notes that the injuries on Ridge's shoulder and head were caused by his falling to his right.  Dr. Jason opines that this indicates that at some point after being shot and bleeding, Ridge's body was lying to the right of its final position.  Dr. Jason opines that this is most consistent with

Ridge's body being turned over from a prone, face-down position while bleeding, to a supine, face-up position in which he was found dead. Based on this blood stain evidence, Plaintiff suggests that Ridge fell face down and that Officers Leonard and McAdams subsequently moved his body after the shooting, despite their sworn statements that they did not. As Defendants note, however, photographs in the SBI Report reveal that the SBI agents turned Ridge's body over at the scene in order to photograph the wounds to his back, and this explains the placement of the blood stains near Ridge's body.[5] Again, this evidence noted by Dr. Jason does not raise an issue of fact as to the excessive force claim.

Finally, Dr. Jason notes in his affidavit that the bullet wound injuring the back of the middle and index fingers of Ridge's left hand was most consistent, in conjunction with the other bullet trajectories, with Ridge having his left hand raised when the shots were fired, placing that hand between the shooter, Officer Leonard, and Ridge's body. Dr. Jason opines that this "raises the possibility" that Ridge's hands were up when he was shot. The fact that Ridge may have had his hand raised when he was shot, however, does not alter the conclusion that Officer Leonard acted reasonably under the circumstances when he shot Ridge. As

_____

[5] In any event, as Defendants note, the manner in which Ridge landed on the ground is not even relevant because it does not indicate whether the officers reasonably perceived a threat before they fired at Ridge. Furthermore, three of the bullets entered Ridge in the front and exited through his back. (*See* SBI Report SBI000015.) Therefore, the physical evidence simply does not support Plaintiff's suggestion that Ridge was shot while walking away from Officer Leonard.

discussed, the evidence shows that when Officer Leonard shot Ridge, Ridge had been coming at Leonard with a sword, in an intoxicated state, after having threatened Leonard and after repeatedly ignoring Leonard's commands to stop and drop the sword.

In sum, the physical evidence, including the findings in the SBI Report, supports Officer Leonard's and McAdams' version of events, and Plaintiff's interpretation of the physical evidence simply fails to create a genuine issue of fact. Indeed, Plaintiff has offered no evidence beyond mere speculation to shed doubt on the veracity of the accounts submitted by Officers Leonard and McAdams. Rather, the accounts given by both Officers Leonard and McAdams, given in interviews on the night of Ridge's death, are similar and corroborate each other's version of events. Furthermore, neither the SBI nor the District Attorney made any findings that any type of conduct suggested by Plaintiff occurred, and the SBI Report specifically notes that the tapes and transcripts of the communications between Officers Leonard and McAdams and other law enforcement personnel during the shooting were "consistent with all other findings in this case." (SBI Report SBI000016.) For all these reasons, summary judgment should be granted to Officers Leonard and McAdams as to all of Plaintiff's claims against them.

Liability as to Defendant City of Randleman

Next, as to Defendant City of Randleman, because Plaintiff's excessive force, negligence, and wrongful death claims against the individual officers fail, these

-23-

claims against the City also fail. As to the Section 1983 claim, a municipality and its officials may not be held liable for constitutional violations involving a subordinate absent a showing that the subordinate violated a constitutional right. *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001); *see also Sigman*, 161 F.3d at 788 ("In the absence of any underlying use of excessive force, liability cannot be placed on either the non-shooting officers, a supervisor, or the City.") (citations omitted). In any event, even if the court were to find that the officers violated Plaintiff's constitutional rights, Plaintiff's Section 1983 claim against the City would still fail because a municipality cannot be held liable pursuant to Section 1983 based on a respondeat superior theory. *See Spell v. McDaniel*, 824 F.2d 1380, 1385-86 (4th Cir. 1987). A municipality may only be held liable when the municipality, through its officials, takes action under an official policy that violates the plaintiff's constitutional rights. *Id.* Defendants' expert John Combs has asserted in his affidavit that the department's policy regarding use of force is in accordance with the law and was being taught to officers at the time of Ridge's shooting. (Combs Aff. ¶ 6.) In response, Plaintiff has presented no evidence to raise an issue of fact as to whether the City had any official policy that resulted in a violation of Ridge's constitutional rights.

Next, since Officers Leonard and McAdams did not act negligently or wrongfully, the City cannot be held liable on a respondeat superior basis for any of Plaintiff's state law claims. Plaintiff has presented no evidence on summary

-24-

judgment to support the conclusory allegations that the City negligently employed, trained, or failed to properly equip its officers.  Defendants, on the other hand, have presented evidence on summary judgment to show that the officers were trained properly.  (*See* Affidavit of Steven Leonard.)  In sum, for all these reasons, the court should grant summary judgment in favor of Defendant City of Randleman.

## IV.  Conclusion

For the reasons stated herein, it is **RECOMMENDED** that the court **GRANT** Defendants' motion for summary judgment  (docket no. 51) and dismiss this action with prejudice.

_____
WALLACE W. DIXON
United States Magistrate Judge

Durham, NC
December 10, 2009

Case 1:07-cv-00366-JAB-WWD   Document 75   Filed 12/10/09   Page 25 of 25